IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02526-MEH

VICTORIA LYNN SINGER,

      Plaintiff,

v.

CAROLYN COLVIN, Commissioner of the Social Security Administration,

      Defendant.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Victoria Singer appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **affirms in part and reverses in part** the ALJ's decision, **and remands** the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her application for disability benefits filed on February 17, 2011. [Administrative Record ("AR") 13] After the

application was initially denied on May 5, 2011 [*id.*], an Administrative Law Judge ("ALJ") scheduled a video hearing upon the Plaintiff's request for October 19, 2012 [AR 143-148]. Plaintiff, her husband, and a vocational expert testified at the October hearing. [AR 45-90] Finding that a consultative physical examination was necessary, the ALJ continued the hearing to April 16, 2013. [AR 91] The same ALJ conducted the second hearing, but a different vocational expert testified. [AR 120-126] The ALJ issued a written ruling on May 6, 2013 finding Plaintiff was not disabled starting on September 17, 2010 because Plaintiff could perform her past jobs and other jobs existing in significant numbers in the national economy considering her age, education, work experience and residual functional capacity. [AR 10-25] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination on July 11, 2014, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-6]. *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on February 25, 1959; she was 51 years old when she filed her application for DIB on February 17, 2011. [AR 251-254] Plaintiff claims she became disabled on September 17, 2010 [AR 244] and reported that she was limited in her ability to work by an inability to sit or walk for long periods and back cramps while performing required job tasks. [AR 298] Plaintiff completed a "Pain Questionnaire" in tandem with her application, in which she described having constant pain in her lower back with "shooting pain down left leg." [AR 297] Plaintiff stated she addressed the pain with medications, a spinal cord simulator, injections, and hot baths. [*Id.*]

The medical record indicates a long history of problems with Plaintiff's neck that originates from a motor vehicle accident in 1996. [AR 371] Plaintiff had an Anterior Cervical Discectomy Surgery and Fusion at the C5-6 and C6-7 discs in 1997 that helped with Plaintiff's left upper extremity pain, but not with her cervical pain. [AR 364, 371-72] During the months post surgery, Plaintiff was diagnosed with fibromyalgia because of pain in other areas of her body. [AR 371] Then, on October 1, 2005, Plaintiff was involved with another motor vehicle accident. [AR 370] As a result, Plaintiff's MRI revealed: (1) a degenerated, bulging disc at C6-7, and (2) an unhealed C5-6 fused disc. [AR 368] On November 13, 2006, Scott Kenneth Stanley, M.D., at Sky Ridge Medical Center performed surgery on Plaintiff's spine where he drilled the C5-6 interspace, removed the C6-7 disc, inserted a bone spacer grafted from Plaintiff's iliac crest, and protected the area with an anterior cervical plate. [AR 337-40, 368] On February 19, 2007, Plaintiff reported she was back at work and doing well post-surgery. [AR 362]

During her six month post-surgery check up, Plaintiff reported pain at the base of her skull, headaches, and numbness down both arms. [AR 360-61] An MRI revealed "good healing and progression" of the discs. [AR 477] Giancarlo Barolat, M.D., Plaintiff's neurosurgeon, recommended a follow-up with a neurological headache specialist to address her headaches. [AR 358] Plaintiff's primary care physician, Kurtis Holmes, D.O., diagnosed Plaintiff with chronic pain syndrome in July 2007 and with a non-specified neck disorder in August 2007. [AR 479, 481] Plaintiff fell in a motel a month later and presented to Dr. Holmes with back and neck pain. [AR 485] Plaintiff received an MRI on October 10, 2007, which revealed no changes in her spine. [AR 467-68] Dr. Barolat attributed the pain to a flare-up of neuromuscular spasms and suggested a short

3

course of steroids and antispasmodic medication.  [AR 357]  Plaintiff presented with neck pain January 24, 2008 [AR 493], February 2, 2008 [AR 495], February 4, 2008 [AR 496], and March 13, 2008 [AR 498].  In September 2008, Plaintiff received an epidural steroid injection.  [AR 505]  A month later, Plaintiff presented with further neck pain and Dr. Holmes recommended "getting nerve roots burned."  [AR 507]  Plaintiff presented with migraines and neck pain on January 23, 2009 and had a rhizolysis treatment.  [AR 512-13]  Plaintiff subsequently received an MRI on March 12, 2009, which showed a mild posterior bulge of the T2-T3 intervertebral discs.  [AR 471]  Dr. Holmes continued Plaintiff on pain medication when she presented with neck pain at the following appointments: July 13, 2009 [AR 522], July 27, 2009 [AR 524], and August 12, 2009 [AR 526].

Plaintiff saw Dr. Barolat again on October 5, 2009; she reported that the treatments only gave temporary relief from her pain.  [AR 351]  Dr. Barolat stated that Plaintiff was on a large dose of narcotics and was in "severe, constant pain."  [*Id.*]  Dr. Barolat recommended trying a lumbar peripheral nerve stimulation, starting first with externalized leads and then implanting the system in her back.  [AR 351-52]  In December 2009, Dr. Barolat implanted one lumbar peripheral nerve stimulation electrode and two upper thoracic peripheral nerve stimulation electrodes in Plaintiff's back.  [AR 335]  Plaintiff reported 85% improvement a week later.  [AR 349]  A month later, Dr. Barolat received a letter from the insurance company stating its concerns of the amount of oxycodone consumed by Plaintiff; Dr. Barolat recommended not refilling narcotics for Plaintiff.  [AR 348]  Dr. Barolat implanted a peripheral nerve simulator in Plaintiff's left hip on March 2, 2010, but recommended a tapering schedule of narcotics post operation.  [AR 345]

Plaintiff saw Phillip T. Rejadas, M.D., once a month from April 2010 to March 2011 to

4

control Plaintiff's pain through medication. [AR 378-86]  In September 2010, Plaintiff stumbled and fell causing pain in her lower back.  She presented to Dr. Holmes with lower back tenderness, pain, and muscle spasms; Dr. Holmes recommended pain medications and Plaintiff's movement to preserve her back. [AR 436]  At the next appointment, Dr. Holmes referred Plaintiff to a new pain management specialist. [AR 434]  The doctor ordered a C.T. scan, which showed mild degenerative lumbar disc disease throughout her spine and mild spinal stenosis at L4-5.  [AR 417]  To address the lower back pain, Steven M. Gardner M.D., a pain specialist at Grand Valley Surgical Center, performed two facet injections in her back on February 11, 2011 and March 14, 2011.  [AR 398] According to Dr. Barolat, these injections gave Plaintiff "only minimal and short-lived relief." [AR 454]  Dr. Barolat performed surgery on July 11, 2011 to ease Plaintiff's discomfort in her back by moving the device implants to a more beneficial location.  [AR 450]  Four months later, Plaintiff reported "good relief from her pain" while using the stimulator.  [AR 459]  However, Plaintiff's back pain flared up in October 2011; Dr. Holmes continued Plaintiff on medication and stated "Plaintiff may need more work on her back."  [AR 633]

Plaintiff's sacroiliac ("SI") joint pain began [AR 549] after the September 2010 fall [AR 438].  Plaintiff saw an orthopaedic doctor, Jeffrey Nakano M.D., on October 5, 2010, who took x-rays and noted only minimal degenerative change. [AR 581]  In January 2012, Plaintiff complained of substantial pain in the right sacral region. [AR 460-62]  Dr. Barolat discussed possible treatments with Plaintiff when "her physical therapist diagnosed her with hypermobile SI joint."  [AR 462] Plaintiff presented in June 2012 [AR 658] and September 2012 [AR 672] for hip adjustments after experiencing pain in her SI joint.  Plaintiff saw Monty Langston M.D., at First Choice Outpatient

Surgery Center who diagnosed Plaintiff with sacroilitis and gave her an SI joint injection.  [AR 682]

Plaintiff informed Dr. Langston that the "pain is sharp, constant and hurts most of the time when she

sits or stands too long."  [*Id.*]

Plaintiff presented to Marshall Meier M.D., for a consultative examination on December 29,

2012.  [AR 701-06]  Plaintiff reported that she could not stand or sit for longer periods of time

because of the pain; however, Dr. Meier noted Plaintiff was able to take off her shoes, get onto the

examination table with no trouble, and sit comfortably during the exam "without pain-mitigating

movements."  [AR 702-03] The doctor found Plaintiff would be able to ambulate and sit for four

hours during each 8-hour workday; lift and carry 50 pounds occasionally and 20 pounds frequently;

perform postural activities occasionally; and should refrain from operating motor vehicles or

equipment requiring extended periods of sitting. [AR 706]

As for Plaintiff's allegations of carpal tunnel syndrome, Plaintiff presented to her primary

care physician, Dr. Kurtis Holmes, D.O., on September 26, 2007 for bleeding under the skin on her

right wrist; Dr. Holmes injected her wrist with steroids.  [AR 483]  Plaintiff received cortisone shots

in her wrist on December 11, 2007 [AR 491] and May 8, 2008 [AR 499].  Nearly a year later, on

January 12, 2009, Plaintiff presented with wrist pain to Dr. Holmes, who prescribed an anti-

inflammatory medication.  [AR 510]  Plaintiff presented for a cortisone injection on June 1, 2009.

[AR 518]   In August, Plaintiff attempted to receive another cortisone shot, but Dr. Holmes

recommended icing the wrist.  [AR 526-27]  Plaintiff came to Dr. Holmes on July 18, 2011 [AR

626],  August 22, 2011 [AR 628], and October 10, 2011 [AR 630] to receive steroid injections in

her hand to decrease pain.  Dr. Holmes then administered another cortisone injection in February

6

2012.  [AR 641]

### III.    Hearing Testimony

On October 19, 2012, Plaintiff her husband, Mike Singer, testified via video teleconference, and vocational expert, Michael Wiseman, testified in person.  [AR 45-90]  Plaintiff testified that she could not go back to her previous position as a manager at an assisted living facility because she "can't sit for very long" or "stand or walk for very long."  [AR 51]   During her previous job, Plaintiff would monitor the staff, help with residents, and generally manage the facility.  [AR 56] Plaintiff stated that she could sit for approximately fifteen to twenty minutes and lift five to ten pounds.  [AR 59]  Plaintiff admitted that the stimulator has helped with her neck and back pain, but her hip still bothered her, in the sacroiliac joint.  [AR 52-53]  Plaintiff testified that she had problems with her hands and had carpel tunnel surgery in both.  [AR 55]  Additionally, Plaintiff testified that her feet would "go to sleep and then they start burning."  [AR 57]   Plaintiff stated that her lower back pain became severe in September 2010, causing her to give up work and recreational activities. [AR 63]  Plaintiff reported that she could do minimal household chores, but stooping and bending over were difficult.  [AR 65-67] Plaintiff also testified that due to a surgery in the early eighties on her right knee, she sometimes had problems with her knee giving out.  [AR 77]

The ALJ then turned to the vocational expert, Mr. Wiseman, who testified that Plaintiff could perform the job of nursing administrator, which would require less physical labor than that of a manager, if she was qualified.  [AR 83]  Mr. Wiseman additionally testified that she could perform her previous jobs as housekeeper and cashier II, according to the Dictionary of Occupational Titles ("DOT").  [AR 75]  The ALJ found the evidence was not compelling because more information was

needed to make a decision, so ordered x-rays and a consultative assessment before addressing the parties at a subsequent hearing.  [AR 78]

At the continued hearing on April 16, 2013, the Plaintiff, her counsel, and vocational expert Judith Gaskow appeared.  [AR 32-65]  Plaintiff's attorney opened by informing the ALJ that the Plaintiff had surgery to rework the stimulator in her back and that "has created problems with her left knee."  [AR 95]  Plaintiff testified at this hearing that her physical problems were: headaches, neck pain leading to two fusion surgeries, left shoulder limitations, carpal tunnel, ganglion cyst in her left wrist, lower back pain, SI joint hypermobility, and left knee pain.  [AR 96-104]  Plaintiff testified she could carry ten pounds, could not write very much, could not pour a gallon of milk, and needed to lay down on and off for one quarter of the day.  [AR 114-116]  Plaintiff reported that she saw a physical therapist who tried to strengthen the muscles around her hip but, as the SI joint was hyper-mobile, "it wouldn't stay in place."  [AR 119]

The vocational expert testified that under sedentary to light work, Plaintiff could perform her previous occupations of housekeeper and facility manager.  [AR 121]  Additionally, Plaintiff could perform jobs at the sedentary level such as appointment clerk and receptionist.  [AR 122]  However, if Plaintiff needed to lay down for one hour during a normal workday or missed three days per month because of "bad days," then all of the positions would be eliminated.  [AR 122-23]  The ALJ ended the hearing by requesting medical records from Dr. Barolat before making a decision.  [AR 125]

The ALJ issued an unfavorable decision on May 6, 2013.  [AR 11-25]

8

## LEGAL STANDARDS

**I.     SSA's Five-Step Process for Determining Disability**

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis

9

proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).   "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).   However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset

date of her disability, September 17, 2010 (Step One).  [AR 15]  Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease in neck and back; right knee arthritis; and bilateral carpal tunnel syndrome post surgery (Step Two).  [*Id.*]  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 15-16]

The ALJ then determined that Plaintiff had the RFC to perform "light work as defined by 20 C.F.R. 404.1567(b) except no repetitive, but frequent manipulat[iv]e work with the left (dominant) hand."  [AR 16]  The ALJ determined the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  [AR 22]  The ALJ determined that the clinical evidence was consistent with the residual functioning capacity because there is "insufficient evidence to support the [Plaintiff's] contention that these impairments render her wholly unable to sustain work-related activities." [AR 19]

The ALJ proceeded to determine the Plaintiff was capable of performing past relevant work as a housekeeper and a facility manager of administrative services (Step Four).  [AR 22-23]  Considering Plaintiff's age, education, work experience and residual functional capacity, the ALJ also found the Plaintiff could perform jobs existing in significant numbers in the national economy. [*Id.*]  As a result, the ALJ concluded that Plaintiff was not disabled at Steps Four and Five of the

sequential process and, therefore, was not under a disability as defined by the SSA.  [AR 24-25]

Plaintiff sought review of the ALJ's decision by the Appeals Council on May 6, 2013.  [AR 1]  On July 11, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-3]  Plaintiff timely filed her Complaint in this matter on September 11, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ erred by rejecting the treating neurosurgeon's medical opinion which limited her to sedentary work; and (2) the ALJ erred by failing to find Plaintiff's sacroiliac joint dysfunction a severe impairment.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

## I.    Treating Physician's Opinion

Plaintiff contends that the ALJ improperly gave little weight to the opinion of her treating physician, Dr. Barolot, by finding that the doctor's limitation to sedentary work was reserved for the commissioner and by basing the remainder of his findings on conclusory statements.  Further, the Plaintiff contends the ALJ afforded greater weight to the consultative examiner's opinion without sufficient explanation, including without consideration of Plaintiff's affidavit regarding the consultative exam.  Defendant counters the ALJ assigned proper weights to the doctors' opinions.

With respect to Dr. Barolot, the ALJ found:

In determining the claimant's residual functional capacity, the undersigned

considered the conclusions of Dr. Giancarlo Barolat, the claimant's treating physician. In a March 2013 medical source statement, Dr. Barolat concluded the claimant could not perform "anything more than sedentary work" (Exhibit 23F). The undersigned afforded this conclusion little weight because the determination of whether a claimant is restricted in her ability to work is reserved for the Commissioner of the Social Security Administration, not examining professionals. A statement such as the claimant "cannot perform anything more than sedentary work", is a dispositive administrative finding requiring familiarity with the Regulations and the legal standards set forth therein. Such a decision is reserved to the Commissi oner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Moreover, the adjudicator cannot assume that the medical source is aware of the definition of the term "sedentary" as it is defined in the Regulations (SSR 96-5p) (20 CFR 416.927(e)(2)). The undersigned has considered the length of treatment relationship and frequency of examinations, the nature and extent of the treatment relationship, specialization, supportability and consistency with the evidence of record (20 CFR 404.1527(d)(3) through (6) and 416.927(d)(3) through (6)). However, Dr. Barolat's opinion is not well supported by the medical evidence and is not consistent with the other substantial evidence of record. For example, at a December 2012 physical exam, the claimant appeared to sit comfortably during the exam and without pain-mitigating movements. She did not appear uncomfortable getting on and off the examination table or removing her shoes. She are [sic] arose spontaneously and unaided from a seated position without discernible discomfort. The claimant was able to tandem walk and Romberg was absent. The claimant was able to walk on her toes or heels. However, the claimant's ambulation was ataxic, favoring her right side. There was discernible discomfort of the cervical and dorsolumbar spine with range of motion testing. Faber's test was positive on the left indicating pain [in] the sacroiliac joint and there was left SI joint tenderness. Nonetheless, the neurological exam was unremarkable. Strength was 5/5 in the bilateral upper and lower extremities. Deep tendon reflexes were 2/4 bilaterally. These findings and observations are consistent with the undersigned's conclusions, not the claimant's allegations.

[AR 21] The December 2012 examination to which the ALJ refers was conducted by Dr. Meier, the consultative examiner. [*Id.*]

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). In fact, "[a]

treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 404.1527(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference

and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d

at 1300; *see also Mays*, 739 F.3d at 574.   At the second step, "the ALJ must make clear how much

weight the opinion is being given (including whether it is being rejected outright) and give good

reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight

assigned." *Krauser*, 638 F.3d at 1330.  If this is not done, remand is mandatory.  *Id.*  As SSR 96-2p

explains:

> Adjudicators must remember that a finding that a treating source medical opinion is
> not well-supported by medically acceptable clinical and laboratory diagnostic
> techniques or is inconsistent with the other substantial evidence in the case record
> means only that the opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions are still entitled to
> deference and must be weighed using all of the factors provided in [§§] 404.1527 and
> 416.927. In many cases, a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet the test for
> controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4).   Hence, the absence of a condition for controlling

weight raises, but does not resolve the second, distinct question of how much weight to give the

opinion.  *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while

absence of objective testing provided basis for denying controlling weight to treating physician's

opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing

the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship, including the treatment provided and
> the kind of examination or testing performed; (3) the degree to which the physician's
> opinion is supported by relevant evidence; (4) consistency between the opinion and
> the record as a whole; (5) whether or not the physician is a specialist in the area upon
> which an opinion is rendered; and (6) other factors brought to the ALJ's attention
> which tend to support or contradict the opinion.

*Id.* at 1331.   In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).   Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330.   Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so.   *Watkins*, 350 F.3d at 1301.

Here, the Court finds the ALJ did not give "good" reasons for giving Dr. Barolot's opinion little weight.   First, assuming without deciding Dr. Barolot's conclusion that Plaintiff is limited to "sedentary" work justifies a finding that his opinion is not entitled to controlling weight, the ALJ's finding of "little" weight is not justified by referring only to Dr. Meier's findings without consideration of the Plaintiff's testimony concerning Dr. Meier.   That is, on February 11, 2013, the Plaintiff submitted an affidavit to the ALJ identifying various inconsistencies between Dr. Meier's report and her experience at the examination.   For example:

> First, Dr. Meier states in his report "Claimant states none of these stop her from being able to perform her occupation."   This is a fabrication.   Claimant never stated words to that effect.   In fact, Claimant stated very directly that her multiple impairments precluded her from any gainful employment. Dr. Meier was untruthful in reporting the claimant made this statement.
> . . .
>
> Third, Dr. Meier states that Ms. Singer enjoys the hobbies of painting and sewing. While Ms. Singer does enjoy painting, she does not sew. Fourth, Dr. Meier alleges she sat comfortably during the exam, did not demonstrate pain mitigating behavior and was not uncomfortable getting on and off the examination table and removing her shoes. Ms. Singer avers that she was uncomfortable and needed to arise repeatedly from a seated position to relieve her discomfort and was unable to sit still.

16

She required a step stool to get on and off the exam table. Notably, Dr. Meier kicked the stool away from the exam table and she asked him to return it to its position so she could get off the table.  Finally, Ms. Singer wore slip on shoes to the appointment which she removed with her feet, without the use of her hands.

Fifth, Dr. Meier alleges the claimant had corrected vision with lenses. The claimant does not wear glasses or contacts.  Sixth, Dr. Meier alleges he examined the Claimant's heart and neck. The Claimant state[s] he did not have a stethoscope and never listened to her heart, lungs or chest. Seventh, Dr. Meier alleges the claimant showed no sign of hepatosplenomagaly.  Yet, he did not examine or palpate her abdomen in any manner at any time.

Eighth, Dr. Meier alleges the Claimant has full range of motion of her cervical spine. This finding would be indeed remarkable in light of her C5-6, C6-7 fusion with instrumentation. Further, Ms. Singer states that he never manipulated her head or neck to check her range of motion.  In light of her history, Ms. Singer is well aware of the nature and extent of a range of motion exam. Ninth, Dr. Meier states she has full range of motion of her wrists and finger/thumb joints. However, he failed to examine or test her hands and wrists.

[AR 324-325 (citations omitted)] Importantly, the ALJ does not mention this testimony or any inconsistencies in Dr. Meier's report; accordingly, the Court reasonably assumes that the ALJ did not consider the Plaintiff's testimony in this regard.  *See Krauser*, 638 F.3d at 1331 (among those factors to be considered are the degree to which the physician's opinion is supported by relevant evidence and the consistency between the opinion and the record as a whole).

In light of the number of identified inconsistencies, and particularly those directly affecting the ALJ's specific findings (i.e., "... the claimant appeared to sit comfortably during the exam and without pain-mitigating movements. She did not appear uncomfortable getting on and off the examination table or removing her shoes. She are [sic] arose spontaneously and unaided from a seated position without discernible discomfort."), the Court finds the ALJ did not fully consider and explain his determination to afford Dr. Barolot little weight and Dr. Meier significant weight.

Moreover, while the ALJ mentioned the factors necessary to consider for the weight given to the doctors' opinions, there is no indication that he actually considered them. *See Krauser*, 638 F.3d at 1330 (ALJ must "give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned.").

Accordingly, the Court will reverse the decision of the ALJ and remand the matter to the Commissioner for further consideration and explanation.

## II.    Severe Impairment

Plaintiff contends that the ALJ erred in failing to list her sacroiliac (SI) joint dysfunction as a severe medical impairment at Step 2.  Specifically, Plaintiff asserts that several doctors have identified and treated the SI joint dysfunction, including Dr. Barolot who relocated nerve stimulator leads he had previously implanted to treat the dysfunction.  In addition, Plaintiff contends the ALJ's finding that Dr. Barolot's opinion concerning the SI is "speculative" is improper.  Defendant counters that it matters not whether the ALJ considered the impairment at Step 2 because he proceeded and considered Plaintiff's SI joint dysfunction when fashioning the RFC.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether a medically determinable impairment may be classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

18

12 months.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error. "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original). Accordingly, the question here is whether the omitted impairments are "medically determinable." *See Salazar*, 468 F.3d at 621 (finding borderline personality disorder was a medically determinable impairment that the ALJ should have identified and assessed at Step Two);

19

*see also Elliott v. Astrue*, 507 F. Supp. 2d 1188, 1194 (D. Kan. 2007) ("Therefore, the first consideration at step two is what, if any, medically determinable impairments plaintiff has regardless of the credibility of her allegations of the severity of those impairments.").

Defendant cites the Tenth Circuit's opinion in *Carpenter v. Astrue* for the proposition that, even if the ALJ errs in finding an impairment not to be severe at Step 2, such error is harmless if the ALJ proceeds to the remaining steps of the evaluation and considers both severe and non-severe impairments in fashioning the RFC.  The Court agrees.  "An error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ, as occurred here, finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)).  In addition, the Court agrees that the ALJ here properly considered the Plaintiff's SI joint pain/dysfunction during subsequent steps of the evaluation.  For instance, the ALJ found:

> Furthermore, a CT of the lumbar spine taken October 2011 showed mild degenerative disease at L4-L5 and L5-Sl. There was mild to moderate bilateral neural foraminal encroachment at L5-Sl (Exhibit 17F). A September 2012 physical examination in conjunction with sacroiliac joint injection revealed the claimant had tenderness overlying the left posterior superior iliac spine, which was close to but not overlying the pocket for her internal programmable generator (spinal cord stimulator). There was positive sheer test, positive stress test and Walker's test over the sacroiliac joint on the left side. A sacroiliac joint injection only provided temporary relief (Exhibit 21F). A computed tomography of the abdomen and pelvis of August 2012 showed mild degenerative changes in each sacroiliac joint with some small amount air in each sacroiliac joint (Exhibit 1OF).
> . . .
>
> Furthermore, at a December 2012 consultative physical examination, .... The claimant had decreased range of motion in the cervical and dorsolumbar spine especially on extension with discernible discomfort. On spinal exam, there was left SI joint tenderness. Finally, the claimant had positive thigh thrust lift causing pain

in her left SI joint (Exhibit 22F). The undersigned has assigned a residual functional capacity at the light physical demand level secondary to the claimant's SI joint pain as well as her decreased range of motion in her lumbar region.
. . .

The undersigned notes the claimant's treating physician, Dr. Holmes restricted the claimant to no heavy lifting or bending (Exhibits 4F, 11F and 19F). The undersigned afforded some weight to these restrictions because they are consistent with the objective evidence, namely SI joint tenderness.

[AR 19-21, 23] Clearly, the ALJ not only considered Plaintiff's SI joint dysfunction in his decision, he specifically considered this impairment in formulating his RFC. Accordingly, the Court finds that any error by the ALJ in omitting the Plaintiff's SI joint dysfunction at Step 2 was harmless.

## CONCLUSION

In sum, the Court finds the ALJ properly considered the Plaintiff's SI joint dysfunction in his opinion and, thus, affirms the ALJ's decision on this basis. However, the Court also finds the ALJ failed to consider (or even mention) the inconsistencies raised by the Plaintiff in a sworn affidavit regarding Dr. Meier's consultative examination; in so doing, the ALJ failed to give good reasons for according Dr. Meier's opinion significant weight and Dr. Barolot's opinion little weight. In this regard, the ALJ's decision is reversed and remanded to the Commissioner for further explanation and consideration.

Therefore, the decision of the ALJ that Plaintiff Victoria Lynn Singer was not disabled is

**AFFIRMED IN PART AND REVERSED IN PART, AND REMANDED** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 18th day of August, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge